People v McGee (2025 NY Slip Op 25239)

[*1]

People v McGee

2025 NY Slip Op 25239

Decided on November 3, 2025

Supreme Court, Kings County

Hecht, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on November 3, 2025
Supreme Court, Kings County

The People of the State of New York

against
Nicholas McGee, Defendant.

Ind. No. 70707-24

ADAs Cassandra Pond and Adam Ghalmi, Kings County District Attorney's Office
Yanique Williams and Brittney Curtis, Legal Aid Society

John T. Hecht, J.

On January 22, 2024, an anonymous Crime Stoppers tip averred that an individual by the name of Heather Stines was storing a corpse in a refrigerator in apartment C4 at 2069 Nostrand Avenue, Brooklyn. Police Officers Jose Henriquez and Michael Ly investigated the tip and ultimately discovered that the refrigerator did indeed contain a decapitated and dismembered human corpse. This decision explains why the officers acted lawfully when they entered the apartment and, despite Ms. Stines's protestations that they needed a search warrant, opened the refrigerator [FN1]
without one.[FN2]

After being assigned to investigate the tip, Officer Henriquez conducted a computer search of the address in question, confirming that Ms. Stines was associated with it. The police database also provided a photograph of Ms. Stines and the additional information that she was the subject of three outstanding bench warrants.
At about 7 PM, Officers Henriquez and Ly went to the apartment referenced in the tip, knocked on its door, and were invited in by Ms. Stines, who appeared to be the person depicted [*2]in the photograph. The apartment was dark. There were no lights on except for a single light in the living room. The apartment was dirty and roach-infested, and it smelled. Significantly, Officer Ly recognized the smell to be that of a dead human body, with which he was familiar from two or three prior assignments when he had encountered a corpse "DOA," or dead on arrival, and been tasked with remaining with it until the medical examiner came, examined it and either removed it or released it to a funeral home.
Ms. Stines offered to show the officers around the apartment. They needed to use their flashlights to see. The entry to the kitchen was covered by a tarp affixed by a nail. Ms. Stines briefly lifted then lowered the tarp, telling the police that the kitchen was behind it but that there "was nothing in there." Officer Ly, however, believing, of course, that a refrigerator would be in the kitchen, lifted the tarp and entered the kitchen. When he did so he observed that the same smell he had previously sensed when he entered the apartment — which he described as "flesh, a dead human body" - was even stronger.
As Officer Ly approached the refrigerator and shined his flashlight onto it, he noticed that it was wrapped in sealing tape. Ms. Stines followed him into the kitchen, becoming increasingly belligerent and aggressive. She blocked the officers' access to the refrigerator when they sought to open it. After a struggle, the officers subdued Ms. Stines, handcuffed her and removed her from the kitchen.
During their interaction, and before Ms. Stines was taken from the kitchen, screaming that the officers needed a warrant to open the refrigerator, Ms. Stines told them variously that the apartment was not hers but rented to her daughter; that she (Ms. Stines) was in the process of moving out; that she was hardly ever there; that it was her apartment; and that the refrigerator did not work. When Officer Ly touched the refrigerator and told Ms. Stines that it felt cold, she said that it contained rotten food that would stink up the apartment if it were opened.
After consultation, the officers received approval from the detective squad to open the refrigerator without a warrant. They pulled off the tape, pried it open — as it turned out, it had been sealed with glue as well - and observed its contents: multiple black garbage bags. At that point, Officer Henriquez too recognized the smell of "something decomposing" or "decomposing flesh," with which he also was familiar from prior experience as a police officer.
The bags were opened and revealed human body parts. Officer Ly found the smell of rotting human flesh to be overpowering and, as shown on body camera footage, gagged. He testified, "It was the worst thing I've ever smelled, and I gagged. I almost threw up."
The medical examiner was summoned to the apartment and removed the bags to the lab for examination, which later revealed that an individual had been killed by blunt force trauma to his head and scores of stab wounds, and that the corpse had then been decapitated and dismembered.
Ms. Stines, whose erratic behavior led to her having been taken to a hospital, was interviewed by Detective Brian Flynn, whom she told that the corpse in the refrigerator had been [*3]placed there by her husband, Nicholas McGee, the defendant in this case. According to Ms. Stines, defendant had killed the individual whose remains were found in the refrigerator. 
Mr. McGee was ultimately located in Virginia, where he confessed to Detective Flynn. Pertinently, defendant told Detective Flynn that he had lived in the subject apartment with Ms. Stines for a number of years both until the homicide and for almost two years after — with the corpse in the refrigerator - and that he had been in Virginia at least four months. He was subsequently tried and, on October 9, 2025, found guilty of murder in the first degree. He currently awaits sentence.
Defendant challenges the police search of the refrigerator leading to the recovery of the human remains, echoing Ms. Stines's assertion at the time that the officers needed a search warrant.
Defendant's effort fails, however, as an initial matter, because he has not established standing to contest the officers' search. In order to challenge police conduct, a defendant must first demonstrate that he has a reasonable expectation of privacy in the premises that were searched (People v Ramirez-Portoreal, 88 NY2d 99, 109 [1996]). Defendant did not establish that he had an expectation of privacy in the subject apartment.
At the time of the search, defendant was not a resident of apartment C4. He had been in Virginia at least four months, and no evidence was presented at the suppression hearing — either by the People or by him - that he still resided in or had a possessory interest in the apartment. The tip did not refer to him. Ms. Stines did not refer to him. She claimed that her daughter rented the apartment; that she herself lived there; that she was moving out; that she was hardly there. The apartment did not appear to be inhabited, as it was unlighted and the kitchen evidently unused if not unusable. Although the police found a benefits card of defendant in the apartment and later learned that Ms. Stines was his wife, those facts alone cannot confer standing on him (see, e.g., People v Jose, 252 AD2d 401 [1st Dept 1998] [defendant's possession of key to apartment and his presence there did not confer standing], affd 94 NY2d 844 [1999]; People v Spencer, 157 AD2d 906 [3rd Dept 1990] [that defendant was still married to estranged wife with whom he had not lived for more than six months insufficient to establish standing], lv denied 75 NY2d 925 [1990]). His statement to Detective Flynn that he had lived in the apartment for a number of years does not establish that, at the time of the police entry, when he was no longer an occupant, he continued to have an expectation of privacy in the premises.[FN3]

For these reasons, defendant's motion to suppress must be denied.
Nonetheless, even if defendant had standing to contest the search of the apartment, his challenge must still fail. The officers lawfully entered the apartment when Ms. Stines invited [*4]them in (see People v Cosme, 48 NY2d 286, 290 [1979]). They were aware that a tipper had alleged that there was a corpse in the refrigerator. Officer Ly immediately recognized the smell of death. He was familiar with that smell from his experience as a police officer who had repeatedly been tasked with staying with a corpse for the evidently considerable time it would take for the medical examiner to arrive, examine the corpse and then either remove it or arrange for its removal to a funeral home.
The scene that confronted the officers when the apartment door was opened was inconsistent with premises that were being used for habitation. In addition to reeking of a corpse, the apartment was filthy and dark. There was but one light on. The kitchen was hidden behind a tarp. The refrigerator was sealed with tape. In other words, it was not being used as a refrigerator in a residence is normally used for temporary food storage. The single occupant became increasingly belligerent and aggressive when the officers attempted to open the refrigerator. She claimed, incongruously, that the refrigerator contained rotten food and therefore should not be opened, because doing so would stink up the apartment. But the apartment already stank. More to the point, who knowingly keeps rotten food in a taped-up refrigerator? She claimed that the refrigerator was not functioning although it obviously was. And the smell of rotting human flesh was stronger in the kitchen than at the apartment's entrance. 
Given these facts, what the police encountered when they entered apartment C4 qualifies for what is generally known as the "plain view" exception to the warrant requirement — though perhaps in this case it may more aptly be called the "plain smell" exception.[FN4]
Under this doctrine, police officers may seize what they plainly observe when they have a right to be in the place from which they make their observation. Officers Henriquez and Ly were lawfully in the apartment, having been invited in by Ms. Stines; Officer Ly recognized the odor of decomposing flesh and confronted, as elaborated above, a ghastly scene, not of a habitation but of a crypt. When Officer Ly saw the taped-up refrigerator, which Ms. Stines prevented him from opening, he saw what he correctly recognized to be not a refrigerator but a coffin, no less than if a hand had been sticking out of it.
As explained in New York Search & Seizure, in a related but pertinent context,
[C]ourts have permitted an officer to seize containers or packages under the plain view theory where the officer can establish that it was immediately apparent, without seeing its contents, that the package contained narcotics . [T]he distinctive configuration of the [*5]containers "proclaimed their contents".... [T]he outward appearance is such that a police officer can immediately recognize it as evidence of a crime.
Barry Kamins, New York Search & Seizure § 4.03[4] [2025 ed] [citing People v Batista, 261 AD2d 218 [1st Dept 1999] [internal citation omitted].
It is well established that detection of an odor by an officer with relevant experience can constitute probable cause for a search (see, e.g., People v Pastrana, 41 NY3d 23, 30 [2023] ["a search based on the odor of marijuana was lawful"]). Officer Ly's recognition of the smell of a decaying corpse ("flesh, a dead human body"), his additional observations of the state of the apartment and the behavior and assertions of Ms. Stines — emphatically that he not look in the refrigerator — together with the refrigerator's appearance — sealed with tape and exuding the distinctive odor of a corpse - "proclaimed" that the refrigerator contained a corpse.
The Batista case, cited in the treatise, demonstrates how this is so. There, when the police surprised the defendant as he entered an apartment they had secured, he let fall what ostensibly was merely a brown paper sandwich bag. But given the surrounding circumstances, namely, that the apartment appeared to be a drug factory and that the officers knew that paper sandwich bags were commonly used to contain narcotics, the officers had the right to seize and open the bag on the spot. As the First Department reasoned, citing the United States Supreme Court,
Not all containers and packages found by the police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglars tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance.
Batista, 261 AD2d at 221 (citing Arkansas v Sanders, 442 US 753, 764 n13 [1979], overruled in part California v Acevedo, 500 US 565 [1991).
The analysis requires only common sense. For an object to proclaim its contents, there need be only "probable cause to associate the property with criminal activity" (Texas v Brown, 460 US 730, 741-742) [1983] [quotation omitted]). Probable cause, in turn, "merely requires that the facts available to the officer would warrant a man [sic] of reasonable caution in the belief that certain items may be contraband or useful as evidence of a crime" (id. at 742 [citation omitted]); see also People v Aqudelo, 150 AD2d 284 [1st Dept 1989]).
The Crime Stoppers tip, albeit anonymous, is not without relevance to this analysis. In People v Tocci, 52 AD3d 541 (2d Dept 2008), lv denied 11 NY3d 858 (2008), the police received a tip that a certain individual had robbed a bank. Based on the tip, they retrieved a photograph of the suspect, which appeared to match surveillance photographs of the robber. Later, the police observed the defendant in a car that matched witnesses' description of the car allegedly used in the robbery and arrested him. As the Second Department reasoned, the police investigation sufficiently corroborated the anonymous tip so as to confirm both the reliability [*6]and the basis of knowledge of the tipper, giving the police probable cause.
Here, similarly, the independent police investigation corroborated the tip that Ms. Stines was unlawfully concealing (if only visually) a corpse in the refrigerator.
Because the police did not need a warrant to open the refrigerator under these circumstances, their discovery of the corpse was lawful and the corpse not subject to suppression.
Dated: November 3, 2025
Brooklyn, New York
JOHN T. HECHT, A.J.S.C.

Footnotes

Footnote 1:The court refers to the appliance as a "refrigerator" although it consisted of two separate but attached components, a refrigerator and a freezer, in both of which body parts were found, because the word "refrigerator" is generally understood to refer to the entire appliance (see Wikipedia [https://en.wikipedia.org/wiki/Refrigerator] ["A freezer is a portion of a refrigerator"]).

Footnote 2:The court issued a short form decision and order denying defendant's motion to suppress on July 30, 2025, referencing what it had said on the record. This decision explains at greater length the court's reasoning with regard to the Mapp portion of the hearing.

Footnote 3:The defense argued at the suppression hearing that defendant's statement to Detective Flynn, while defendant was in Virginia, that he had lived in apartment C4, as well as the finding of the benefits card there were sufficient to confer standing (07/30/25 tr at 63-64).

Footnote 4:The "plain smell" exception has been recognized by a number of courts (see, e.g., United States v Williams, 822 F2d 1174, 1183 n105 [DC Cir 1987]); it is not a neologism of this court. A criticism of the doctrine, that smell is evanescent and therefore difficult to preserve for evaluation at trial, does not dissuade the court from applying it. Here, in addition to common experience, which teaches that a decomposing corpse has a distinctive foul odor, the body camera footage of Officer Ly demonstrates his contemporaneous reactions to the smells he observed, including his gagging, and the medical examiner testified at trial that, during the autopsy, the decomposing tissues continued to have a smell (10/8/2025 tr at 347).